LAURA E. DUFFY
United States Attorney
PHILLIP L.B. HALPERN
California State Bar No. 133370
EMILY W. ALLEN
California State Bar No. 234961
Assistant U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9738
Fax:       (619) 546-0450
Email:     phillip.halpern@usdoj.gov
           emily.allen@usdoj.gov

Attorneys for Plaintiff
United States of America



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,                Case No.: 14CR2980-BEN

       Plaintiff,
  vs.                                    **INFORMATION**

LYNDA SANABRIA,

       Defendant.

The United States Attorney charges, at all times material:

<u>SECONDARY MORTGAGE MARKET FRAMEWORK</u>

1.   In the United States, residential mortgage lenders typically sell the loans they originate to third-party investors, to the Federal National Mortgage Association (known as "Fannie Mae"), or to the Federal Home Loan Mortgage Corporation (known as "Freddie Mac"). By selling these loans, lenders reduce their credit risk and gain access to additional capital, which in turn provides borrowers with greater access to mortgage loans. This secondary mortgage market exceeds $10 trillion, and is essential to the healthy functioning of the American housing market and the American economy.

2. Secondary mortgage purchasers often combine the loans they purchase into what is known as collateralized mortgage obligations ("CMOs") or residential mortgage-backed securities ("RMBSs"). CMOs and RMBSs are then typically re-sold to institutional investors such as pension funds and insurance companies. These products are then also often combined into ever-more complex collateralized debt obligations ("CDOs"), which may include other types of debt obligations such as corporate loans.

3. This form of mortgage securitization provides increased capital because the risk of default is, in theory, greatly reduced by the aggregation of large numbers of mortgage loans, allowing even high-risk individual loans to be categorized as "safe" investments when they are pooled together.

4. As a result of the secondary market for mortgages, the connection between borrowers and lenders has weakened, as loan originators no longer have a direct stake in ensuring that individual borrowers can repay their loans. As a result, secondary purchasers, who bear the risk of default, heavily influence lending standards. As mortgage loans are re-packaged and securitized, collateralized, and re-sold into products seen as "safe" investments, those lending standards deteriorate. The resulting complexity of mortgage securities products, the lack of regulation and ratings standards, and the abundance of credit availability are often cited as the causes or the financial collapse of 2008.

## BACKGROUND ALLEGATIONS

5. From approximately 2004 until approximately 2011 ("the relevant period"), defendant LYNDA SANABRIA ("SANABRIA") worked on and off at J.P. Morgan Chase ("Chase"). SANABRIA worked at various

times as a supervisor in the Residential Loan Department. Chase was a financial institution insured by the Federal Deposit Insurance Corporation.

6. As part of her job at Chase, SANABRIA sold mortgage loans to third-party investors on the secondary market. The majority of these loans included distressed or non-performing second mortgage notes. Chase sold the notes to the highest bidder or offeror after distributing lists of the loans offered for sale.

7. During the relevant period, SANABRIA sold loans to secondary purchaser I.H., through businesses I.H. operated including Note Tracker Corp., Nationwide Servicing Center, Ocean 18, LLC, and Instant Mortgage Lending, and through Blue View, which I.H. operated along with a business partner and the company's owner, S.R. During the relevant period, T.D. worked with both I.H. and S.R. at each of these businesses. I.H. and S.R. operated from offices in San Diego, within the Southern District of California.

## COUNT ONE

### 18 U.S.C. § 371

### (CONSPIRACY)

8. Paragraphs 1 through 7 are realleged and incorporated by reference herein.

9. From in or around 2004, through in or around 2010, in the Southern District of California and elsewhere, defendant LYNDA SANABRIA knowingly and intentionally conspired and agreed with I.H., S.R., T.D., and others to commit Bank Bribery, in violation of Title 18, United States Code, Section 215, and Tax Evasion, in violation of Title 26, United States Code, Section 7201.

<u>Purpose of the Conspiracy</u>

10. It was the purpose of the conspiracy that SANABRIA would corruptly accept cash and other things of value in excess of $1,000 from I.H., S.R., and T.D., with the intent to be influenced and rewarded in connection with the business and transactions of Chase. Specifically, SANABRIA would provide inside information about competing bids, prices, and other aspects of Chase's sale of mortgage notes so that I.H., S.R., and their investment companies would gain an unfair competitive advantage in purchasing those mortgage notes from Chase. In return, I.H., S.R., and T.D. would make personal payments to SANABRIA, which were sometimes paid in cash and otherwise concealed from the Internal Revenue Service to assist SANABRIA in evading federal income taxes on the illicit income.

<u>Manner and Means of the Conspiracy</u>

11. To further the criminal conspiracy, SANABRIA, I.H., S.R., T.D., and other co-conspirators utilized the following manner and means, among others:

    a. Through her employment selling mortgage loans at Chase, SANABRIA would gain access to bid information from each competing bidder, and to information about the loans offered for sale.

    b. I.H. and S.R. would offer to pay SANABRIA approximately $100 to $300 per loan in exchange for information about the competing bids, and to ensure that their bids were accepted by Chase.

    c. SANABRIA would corruptly accept the personal payments from I.H. and S.R. and, in return, would provide information

about competing bids and about the loans Chase offered for sale, to ensure that I.H. and S.R.'s bids were accepted.

    d. In violation of Chase policy, and in return for personal payments from I.H. and S.R., SANABRIA would provide I.H. with personal information about the loan borrowers which was not available to their competitors.

    e. I.H., S.R., and T.D. would arrange to pay SANABRIA in cash and by personal check, which they would mail to SANABRIA at her home, in order to conceal the payments and to avoid reporting the payments to the IRS.

## Overt Acts

12. In furtherance of this conspiracy, and to carry out its objects, the following overt acts, among others, were committed within the Southern District of California and elsewhere:

    a. In or around 2004, while I.H. worked at Blue View, I.H. contacted SANABRIA at Chase and asked for her personal cell phone number. Later, I.H. called SANABRIA's cell phone and asked if she wanted to make extra cash in return for inside information about the loans Chase offered for sale. SANABRIA agreed.

    b. Following this conversation, after I.H. submitted bids to purchase loans, SANABRIA contacted I.H. and informed him of the details of competitor bids, in order to ensure that I.H.'s bid was successful. I.H. paid SANABRIA for this information, as agreed.

    c. In or around 2004, I.H. sent SANABRIA approximately $70,000, which SANABRIA used to purchase property near Lake

Havasu, Arizona, as payment for SANABRIA's assistance ensuring that I.H.'s and S.R.'s bids were successful.

    d. In or around early 2008, I.H. stopped issuing IRS Form 1099s to SANABRIA reflecting the illegal payments, so that she could avoid paying income taxes on the illegal payments.

    e. In or around 2008, SANABRIA stopped reporting to the IRS and paying taxes on the illegal income.

    f. On or about November 1, 2010, SANABRIA received a check from I.H. written from the account of Note Tracker Corp., for $3,450, in return for her influence ensuring that I.H.'s bid was accepted to purchase 23 loans from Chase. Per I.H.'s instructions, no IRS Form 1099 was issued in connection with this payment.

    g. In order to disguise the nature of the payments, in or around July 2014, I.H. referred to them as birthday gifts or consulting fees, when in fact they were payments made to influence SANABRIA in her position at Chase.

All in violation of Title 18, United States Code, Section 371.

DATED: 10/15/2014

LAURA E. DUFFY
United States Attorney

EMILY W. ALLEN
Special Assistant U.S. Attorney